## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| ELISHA CHAPMAN, on behalf of himself and all others similarly situated,<br><br>            Plaintiff,<br><br>        v.<br><br>QUEST GLOBAL SERVICES-NA, INC., BELCAN ENGINEERING GROUP, LLC, CYIENT, INC., AGILIS ENGINEERING, INC., PARAMETRIC SOLUTIONS, INC., and RAYTHEON TECHNOLOGIES CORPORATION, PRATT & WHITNEY DIVISION,<br><br>            Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br><br><br>December 17, 2021 |

Plaintiff Elisha Chapman, individually and on behalf of a class of similarly situated individuals, brings this action for damages and injunctive relief under the antitrust laws of the United States against QuEST Global Services-NA, Inc. ("QuEST"), Belcan Engineering Group, LLC ("Belcan"), Cyient, Inc. ("Cyient"), Agilis Engineering, Inc. ("Agilis"), Parametric Solutions, Inc. ("PSI") (collectively the "Supplier Defendants" or "Suppliers") and Raytheon Technologies Corporation, Pratt & Whitney Division ("Pratt & Whitney") (together with the Supplier Defendants, "Defendants"). Plaintiff alleges as follows:

### INTRODUCTION

1.      One of the nation's leading aerospace companies and numerous outsource engineering supply companies, as well as their managers or executives, conspired to restrain competition and reduce compensation for engineers and other skilled workers. Plaintiff is a former

employee of Belcan and brings this suit individually and on behalf of the proposed Class to recover damages and to prevent Defendants from retaining the benefits of their antitrust violations.

2.      Defendants ostensibly compete with one another to hire and retain employees throughout the United States.  However, beginning no later than 2011, Defendants entered into express agreements to avoid competing for employees, by refraining from soliciting or hiring each other's employees.   These "no-poach" agreements continued through at least 2019, and Defendants' most senior executives.

3.      These no-poach agreements were not necessary to any legitimate business transaction or lawful collaboration among the companies.  Defendants' conspiracy was strictly a tool to suppress their employees' compensation, and hence control their own expenses.

4.      These no-poach agreements accomplished their purpose.  They reduced competition for Defendants' employees and suppressed Defendants' employee compensation below competitive levels. The conspiracy disrupted the efficient allocation of labor that would have resulted if Defendants had competed for, rather than colluded against, their current and prospective employees.

5.      Defendants' agreements also denied their employees access to job opportunities, restricted their mobility, and deprived them of significant information that they could have used to negotiate for better compensation and terms of employment.

6.      Defendants were aware that their conduct was illegal.  Indeed, on multiple occasions, managers and executives raised concerns that restricting the hiring of employees as required by the no-poach agreements was illegal.  But Defendants persisted in the conduct anyway.

7.      The United States Department of Justice ("DOJ") publicly revealed the conspiracy on December 9, 2021, issuing a press release announcing a criminal complaint against Mahesh

Patel ("Patel"), an executive of Pratt & Whitney.  *See* Press Release, DOJ, *Former Aerospace Outsourcing Executive Charged for Key Role in a Long-Running Antitrust Conspiracy Indictment* (Dec. 9, 2021) (available at https://www.justice.gov/opa/pr/former-aerospace-outsourcing-executive-charged-key-role-long-running-antitrust-conspiracy) ("DOJ Press Release").  The DOJ alleges that between 2011 and 2019, Patel participated in a conspiracy in which his employer, "Company A" (identified below as Pratt & Whitney), and numerous Suppliers ("Companies B through F" (identified below as the Supplier Defendants)) agreed with one another not to solicit or hire each other's employees.  Affidavit of Christopher Mehring, *United States v. Patel*, No. 3:21-mj-01189-RAR-1, ECF No. 15 (D. Conn. Dec. 9, 2021) ("Mehring Affidavit").

## JURISDICTION AND VENUE

8.      This action arises under section 1 of the Sherman Act (15 U.S.C. §1) and section 4 of the Clayton Act (15 U.S.C. §15(a)). Plaintiff seeks injunctive relief and the recovery of treble damages, costs of suit, and reasonable attorneys' fees for the injuries that Plaintiff and members of the Class (defined below) sustained as a result of Defendants' anticompetitive conduct.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331, 1337(a), 1407, and 15 U.S.C. §§15 and 26.

9.      Venue is proper in this District pursuant to 15 U.S.C. §§15(a), 22 and 28 U.S.C. §§1391(b), (c), and (d) because during the proposed Class Period (defined below), Defendants resided, transacted business, were found, or had agents in this District, and Defendants carried out a substantial portion of the activity that affected interstate trade and commerce in this District.

10.     During the Class Period, Defendants assessed, hired, and retained engineers and other skilled workers in a continuous and uninterrupted flow of interstate commerce, including in

this District. Defendants' conduct had direct, substantial, and reasonably foreseeable effects on interstate commerce in the United States, including in this District.

11.      This Court has personal jurisdiction over Defendants because they, either directly or through the ownership and/or control of their subsidiaries: (a) transacted business throughout the United States, including in this District; (b) participated in the assessment, hiring, and retention of engineers and other skilled workers throughout the United States, including in this District; (c) had and maintained substantial aggregate contacts with the United States as a whole, including in this District; or (d) were engaged in an illegal conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

12.      By reason of the unlawful activities alleged herein, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiff and members of the Class. Defendants, directly and through their agents, engaged in activities to limit competition and fix, raise, maintain, and/or stabilize the compensation and terms of employment of their engineers and other skilled workers in the United States, which unreasonably restrained trade and adversely affected the market for their services.

## PARTIES

### Plaintiff

13.      Plaintiff Elisha Chapman is a citizen and resident of the State of North Carolina. Mr. Chapman worked as an Engineering Intern and Project Engineer for Belcan in Florida from

2016 to 2018, working exclusively on Pratt & Whitney contracts.  Mr. Chapman was injured in his business or property by reason of the violation alleged herein.

**Defendants**

14.    Defendant Raytheon Technologies Corporation, Pratt & Whitney Division ("Pratt & Whitney") is a company organized and existing under the laws of Delaware with its principal place of business in East Hartford, Connecticut. It is "Company A" as alleged in the Mehring Affidavit and is a subsidiary of Raytheon Technologies Corporation.  During the relevant period, Pratt & Whitney participated in the conspiracy and, through its executives, managers, employees, or agents, committed overt acts in furtherance thereof.

15.    Upon information and belief, Defendant QuEST Global Services-NA, Inc. ("QuEST") is "Company B" as alleged in the Mehring Affidavit.  QuEST was an Ohio corporation with a principal place of business in East Hartford, Connecticut.  It was one of the Suppliers whose employees worked on projects for Pratt & Whitney on an outsource basis.  It competed with Pratt & Whitney and other Suppliers with respect to the recruitment and retention of engineers and other skilled workers.  During the relevant period, QuEST participated in the conspiracy and, through its executives, managers, employees, or agents, committed overt acts in furtherance thereof.

16.    Upon information and belief, Defendant Belcan Engineering Group, LLC ("Belcan") is "Company C" as alleged in the Mehring Affidavit.  Belcan was an Ohio corporation with a principal place of business in Windsor, Connecticut.  It was one of the Suppliers whose employees worked on projects for Pratt & Whitney on an outsource basis.  It competed with Pratt & Whitney and other Suppliers with respect to the recruitment and retention of engineers and other skilled workers.  During the relevant period, Belcan participated in the conspiracy and, through its executives, managers, employees, or agents, committed overt acts in furtherance thereof.

17.    Upon information and belief, Defendant Cyient, Inc. ("Cyient") is "Company D" as alleged in the Mehring Affidavit.  Cyient was a California corporation with a principal place of business in East Hartford, Connecticut. It was one of the Suppliers whose employees worked on projects for Pratt & Whitney on an outsource basis.  It competed with Pratt & Whitney and other Suppliers with respect to the recruitment and retention of engineers and other skilled workers. During the relevant period, Cyient participated in the conspiracy and, through its executives, managers, employees or agents, committed overt acts in furtherance thereof.

18.    Upon information and belief, Defendant Parametric Solutions, Inc. ("PSI"), is "Company E" as alleged in the Mehring Affidavit.  PSI was a Florida corporation with a principal place of business in Jupiter, Florida.  It was one of the Suppliers whose employees worked on projects for Pratt & Whitney on an outsource basis.  It competed with Pratt & Whitney and other Suppliers with respect to the recruitment and retention of engineers and other skilled workers. During the relevant period, PSI participated in the conspiracy and, through its executives, managers, employees or agents, committed overt acts in furtherance thereof.

19.    Upon information and belief, Defendant Agilis Engineering, Inc. ("Agilis") is "Company F" as alleged in the Mehring Affidavit.  Agilis was a Florida corporation with a principal place of business in Palm Beach Gardens, Florida.  It was one of the Suppliers whose employees worked on projects for Pratt & Whitney on an outsource basis.  It competed with Pratt & Whitney and other Suppliers with respect to the recruitment and retention of engineers and other skilled workers.  During the relevant period, Agilis participated in the conspiracy and, through its executives, managers, employees, or agents, committed overt acts in furtherance thereof.

## FACTUAL ALLEGATIONS

### Defendants' Conspiracy

20.      Pratt & Whitney, a subsidiary of Raytheon Technologies Corporation, is "one of the largest aerospace engine design, manufacture, and service companies in the United States." Mehring Affidavit, ¶5.  To meet its labor needs during the relevant period, Pratt & Whitney relied in part on agreements with outsource engineering supply companies.  Pursuant to the agreements, each outsource company would assign engineers and other skilled workers from its own employees to complete a particular project, and then would receive an agreed-upon payment from Pratt & Whitney for the work.  Supplier Defendants "were among the Suppliers whose employees worked on projects for [Pratt & Whitney] on an outsource basis. Together with [Pratt & Whitney], these companies competed against one another to recruit and hire engineers and other skilled workers. As Suppliers, they also competed against one another for outsource work projects from [Pratt & Whitney]."  *Id.*, ¶6.

21.      Over a period spanning at least the years 2011 through 2019, Defendants joined a conspiracy to reduce and limit compensation and mobility of their engineers and other skilled workers. In furtherance of the conspiracy, Defendants, and each of them, entered into no-poach agreements to eliminate competition between and among themselves for employees, focusing primarily upon engineers and other skilled workers. The conspiracy was executed, enforced, and concealed by the companies' most senior executives and managers, including Patel.  Such no-poach agreements were not reasonably necessary to any separate, legitimate business transaction or collaboration among the companies.

22.     Defendants participated in meetings, conversations, and communications to discuss the solicitation of each other's employees, and agreed during those meetings, conversations, and communications not to solicit each other's employees.

23.     In addition to the extensive evidence of collusion set out below, the market for engineers and other skilled workers in the aerospace industry is characterized by plus factors that render the industry susceptible to collusion and bolster the plausibility of the conspiracy alleged herein.  These include: (1) numerous opportunities to collude; (2) high entry barriers for aerospace firms and suppliers; (3) high exit barriers for engineers and other skilled workers; and (4) inelastic demand and a lack of substitutes for engineers and other skilled workers.

### Restricting Hiring and Recruiting Among Suppliers

24.     According to the Mehring Affidavit, "[b]eginning as early as 2011, certain Suppliers who shared [Pratt & Whitney] as a mutual customer reached agreements to restrict the hiring and recruiting of engineers and other skilled-labor employees between and among them." Mehring Affidavit, ¶14.  "Around the same time, evidence shows PATEL was aligned with and actively engaged in the conspiracy." *Id.*, ¶15.

25.     "PATEL explicitly told Supplier managers and executives that [Pratt & Whitney]'s Suppliers should not be recruiting and hiring each other's employees. The Suppliers, in turn, understood that these restrictions applied mutually among the Suppliers themselves." *Id.*, ¶16.

26.     In September 2016, Patel sent an email to an executive employed at PSI, in which Patel said: "'Last time we talked you assured me that you will not hire any [Pratt & Whitney] partners employee.  This must stop, otherwise others will also start poaching your employees.'" *Id.*, ¶19.

27.     In addition to communicating the no-poach rule to each Supplier individually, Patel also discussed the rule at a dinner he had with representatives of QuEST, Belcan, and Cyient in December 2015.  An email sent to several employees of Belcan after the dinner reported that Patel had told Supplier representatives not to poach each other's employees.  *Id.*, ¶20.

28.     "PATEL justified the no-hire/no-recruit agreement by appealing to the wage-suppression benefits that it provided to the conspirators, either by referring specifically to wages or salaries, or more broadly, to shared costs or prices."  *Id.*, ¶21.

29.     Patel referred to this financial rationale in discussions with Suppliers.  For example, in January 2017, Patel contacted PSI after it hired an employee of Cyient and said, "'Please do not hire any partners employee, whether they approached or you approached. That is the only way we can pre[v]ent poaching and price war.'"  *Id.*, ¶24.  Further, in March 2016, while discussing Patel's hiring restrictions with an executive of another Supplier, an executive of PSI wrote: "'MAHESH says he does not want the salaries to increase.'"  *Id.*

30.     Suppliers also repeated this rationale to Patel.  For example, in April 2017, an executive of QuEST emailed Patel complaining that Cyient had hired an employee of QuEST, telling him "This is against our agreements with our employees and against our known expectations of [Pratt & Whitney] for the cooperation of the outsource companies."  *Id.*, ¶25.  The executive warned Patel that if such hiring did not stop, it would "drive the price structure up."  *Id.* Patel sent an invitation for a "private discussion" the next day with the executives of the two competing Suppliers involved marked as "required" attendees.  *Id.*

31.     Patel functioned as an intermediary among the Supplier Defendants to police and enforce the agreement between them.  "At times, when infractions of the agreement occurred, a Supplier alerted PATEL to the violation and requested that he assist in preventing or deterring

such conduct. PATEL often responded to these requests by reprimanding the noncompliant Supplier." *Id.*, ¶26.

32.    "For example, in May 2016, a [Belcan] Vice President was informed by a colleague that '[a]nother employee' had been hired by [PSI] to work on outsourcing project for a non-[Pratt & Whitney] company. The colleague asked [the Belcan Vice President] if he 'ever discuss[ed] the last one with Mahesh.' [The Belcan Vice President] assured the colleague that he had spoken to PATEL and that PATEL said he'd talk to [PSI] about it. [The Belcan Vice President] subsequently emailed Patel to complain that his company was 'losing another employee to [PSI],' and named the employee." *Id.,* ¶27.

33.    "In November 2016, [an executive of PSI] wrote an email to PATEL complaining about '[Belcan] actively Recruiting [PSI] employees.'  PATEL forwarded [the executive of PSI]'s email to [executives of Belcan] and another [Belcan] manager, saying, '[w]e must not poach each other partners employee. Please communicate to [Belcan] HR not to interview or hire active employees working on [Pratt & Whitney] work.'" *Id.*

34.    "[I]n a February 2017 email from [QuEST]'s files, [an executive of QuEST] responded to the news that [Belcan] had made an employment offer to a [QuEST] engineer by stating '[Belcan] is not allowed to poach any of our employees and I will plan to block this immediately. I will send this to Mahesh today.'  Approximately four minutes later, [a QuEST executive] forwarded the information about [Belcan]'s offer directly to PATEL, adding 'I am very concerned that [Belcan] believes they can hire any of our employees. …. Could you please stop this person from being hired by [Belcan]?'" *Id.*, ¶28 (ellipsis in original).

35.    In January 2017, after Cyient informed Patel by email that PSI had hired a Cyient employee, Patel forwarded the email from Cyient to PSI, stating: "'Last time we talked you assured

me that you will not hire any [Pratt & Whitney] partners employee. This must stop, otherwise others will also start poaching your employees. Please advise.'" *Id.*, ¶29.

36.     Patel's efforts to enforce the no-poach agreement were effective.  For example, a September 2016 internal Belcan email shows that a Belcan executive told Patel about a recent poaching incident by PSI.  Patel then emailed PSI, saying: "'You had assured me that [PSI] will never soliciting [sic] [Pratt & Whitney]'s long term partners [sic] employees. … Please send me in writing that proper steps has [sic] taken place to curtail this practice.'" *Id.*, ¶31.  A PSI executive indicated, in a subsequent email, that he understood Belcan was the source of this complaint: "'[Belcan] is making a big stink right now over any solicitations.'" *Id.*  In response to Patel's admonishment, a PSI executive instructed a coworker to "'[p]lease stop speaking to any [Belcan] or other [Pratt & Whitney] supplier companies about transitioning to a [PSI] Office immediately.'" *Id.*  The coworker replied, "'[c]onsider it done.'" *Id.*

37.     In June 2018, Patel communicated with executives from Belcan about Belcan's recent employment offer to an engineer at QuEST.  A recruiter at Belcan explained in an internal email that "'[QuEST] complained to [Pratt & Whitney] that we are "stealing" their people, and [Pratt & Whitney] threatened to pull all POs from [Belcan] if we hire him.'" *Id.*, ¶33.  The next day, a Belcan employee emailed Patel, "Per our conversation yesterday, this email is to confirm that we have rescinded the offer letter for" that engineer.  *Id.*

38.     Suppliers also discussed the no-poach agreement amongst themselves. For example, in a September 2019 email, an executive of Cyient asked an executive of Agilis to stop "actively recruiting" Cyient employees.  *Id.*, ¶34.  Agilis agreed, telling Cyient that Agilis's "'general aim is NOT to recruit from the local "competition" because no one wins; salaries rise, the workforce get [sic] unstable, and our margins all get hurt.'"  The Cyient executive thanked the

Agilis executive and said: "'I flat out ask our teams not to hire people from the other [Pratt & Whitney] suppliers.'"  *Id.*

39.     At least as early as January 2016, well before several of the examples of unlawful conduct described herein, certain managers and executives at Belcan began raising concerns with Patel that the conduct of Pratt & Whitney and the Suppliers was unlawful, specifically because they violated the antitrust laws.

40.     Early in January 2016, a General Manager for Belcan received an email describing a civil lawsuit in which several major companies were accused of (as the Belcan employee forwarding the email put it) "'engaging in illegal anti-poaching agreements . . . the companies involved had promised each other not to actively recruit employees from one another.'"  *Id.*, ¶35 (ellipsis in original).  The General Manager subsequently planned a meeting with Patel in which one of the items for discussion was "'[i]nformal poaching agreement between outsource suppliers. Recent Apple lawsuit because these agreements are illegal'" (an apparent reference to the 2015 settlement in *In re High-Tech Employee Antitrust Litigation*, No. 5:11-cv-2509 (N.D. Cal.)).  *Id.*, ¶36.

41.     The same General Manager raised the unlawful nature of the restrictions on recruiting and hiring with Patel again in February 2017.  In a series of emails, Belcan's Human Resources Director and the General Manager discussed an upcoming call with Patel, which was planned concerning a recent allegation that Belcan had hired an Engineer from QuEST in violation of the no-poach agreements.  The HR Director noted her concern that "'there is an anti-trust issue by turning people away solely based on their previous employer.'"  *Id.*, ¶37.  The General Manager acknowledged these concerns about illegality in a subsequent email to the HR Director, noting "[Pratt & Whitney] (Mahesh Patel) is asking (insisting) that we not interview anyone currently

employed by our competitors . . . I'm not sure if this is legal, but that is what they are requesting we do." *Id.* The next day, Belcan's HR Director reported that she and another Belcan manager "'spoke with Mahesh this afternoon. He understands our concern with antitrust compliance, however, he still requested that our recruiters not speak with applicants who are current[ly] employed with [Belcan] competitors.'" *Id.*

### Restricting Hiring and Recruiting Between Pratt & Whitney and QuEST

42.     As part of the conspiracy alleged, Patel also agreed with employees of QuEST to restrict Pratt & Whitney's hiring and recruiting of engineers and other skilled workers from QuEST through two main means: (1) two-year tenure restriction; and (2) hiring freezes.

43.     In 2011, Pratt & Whitney and QuEST reached an agreement that Pratt & Whitney would not hire QuEST's employees until they had worked at QuEST for at least two years. Pratt & Whitney and QuEST employees discussed the agreement at a dinner in September 2011. *Id.*, ¶42. The day after the dinner an executive of QuEST sent an e-mail to the attendees stating "'We truly appreciate and value our strategic relationship. ... I thought I would take the lead in summarizing what we discussed last night and proposed next steps…'" *Id.* (ellipsis in original). The first topic was "Personnel Transfers," which the QuEST executive described as "the new policy/guidelines" that a Pratt & Whitney Vice President had reviewed at the dinner. *Id.* The new policy related to a "min. 24 months" for such "Personnel Transfers." *Id.* The QuEST executive wrote, "Following Mahesh's previous counsel, I am not going into detail in writing on this subject." *Id.*.

44.     Beginning in late 2011, managers and executives from QuEST communicated with Patel to maintain and enforce this two-year tenure agreement. *Id.*, ¶43. For example, in October 2012, an executive of QuEST responded to a voicemail from Patel by emailing: "'[Employee]'s

tenure at [QuEST] dates to May 2011. Based on our agreement of two year minimum tenure, we would ask that [Pratt & Whitney] not pursue employment of [him] at this time.'" *Id.*, ¶44.

45.     Further, in June 2015, Patel emailed QuEST managers, stating that Pratt & Whitney "'is interested in interviewing and hiring'" two QuEST employees, "'[p]lease provide your concurrence.'"  *Id.*, ¶45.  One of the QuEST managers responded that one of the employees in question had worked at QuEST for four and a half years, and thus "'meets requirements,'" but the other "'only has 8 months and does not meet obligation, so [QuEST] cannot provide concurrence.'" *Id.*.

46.     In April 2017, a manager wrote in an internal email that he had heard Pratt & Whitney wanted to hire a particular QuEST employee, but he "'wouldn't meet our requirements for two years.'"  *Id.*, ¶46.  Two days later, the manager emailed Patel, saying the employee "'does not meet tenure requirements.'"  *Id.*  Patel then told a Pratt & Whitney Human Resources employee: "[QuEST] will not release him…..He has not completed 2 [y]ears as our verbal agreements.'" *Id.* (ellipsis in original)..

47.     In furtherance of the conspiracy between Pratt & Whitney and QuEST, the two companies also implemented hiring freezes.  From approximately 2015 through 2017, Patel and representatives of QuEST agreed on periods of time in which Pratt & Whitney would not recruit or hire QuEST employees, with limited exceptions.  These periods were referred to as hiring "freezes" or "moratoria."  *Id.*, ¶47.

48.     Each hiring freeze began with QuEST managers and executives lobbying Patel to restrict or stop hiring from QuEST.  For example, in September 2015, Patel emailed three QuEST employees, asking for the company's "concurrence" in Pratt & Whitney's hiring of two QuEST engineers. One QuEST employee responded by complaining about the recent increase in Pratt &

Whitney's hiring.  While the QuEST employee agreed that both of the employees in question "'have at least two years [QuEST] experience, so [they] meet the "handshake agreement" level'" he stated "'[QuEST] will not be able to concur with any more hiring of [QuEST] employees this year. … All we can do is highlight the problem and ask that [Pratt & Whitney] support us going forward to prevent further hiring of our resources." *Id.*, ¶48.  In a subsequent email, a QuEST executive added, "'Mahesh, we truly need your help in blocking these two hires and putting a moratorium on [QuEST] hires for the remainder of the year.'" *Id.*

49.    Emails demonstrate that in January 2016, Patel and an executive of QuEST were working to establish a new hiring freeze for 2016.  The QuEST executive reported to his colleagues that "'I am planning to meet with Mahesh later this week to discuss the hiring matrix I developed to limit the hiring. Also I am going to tell him that he needs to block' two [QuEST] engineers 'from being hired until we come to an agreement on the acceptable limit to hire [from] our team.'" *Id.*.

50.    Patel announced the beginning of hiring freezes to other Pratt & Whitney personnel involved in recruiting and hiring engineers and directed them to comply with it.  For example, in an early September 2017 email to the Vice President of Human Resources-Engineering, Patel requested that she "'direct your HR team not to hire [QuEST] outsource resources currently deployed on [Pratt & Whitney] projects till end of this year….[QuEST] senior leadership including CEO has repeatedly raised concerns on [Pratt & Whitney] hiring [QuEST] employees. We will lift [QuEST] hiring restriction from Jan 1, 2018.'" *Id.*, ¶50.

## Effects of No-Poach Conspiracy

51.    Labor markets are not perfectly competitive. They are not like commodity markets where market-wide demand and supply tend to determine a single market price.  Defendants do

not simply pay a "market wage" for a particular employee, as they might pay a "market price" for a pound of silver on a metals exchange. Instead, labor market participants determine prices by interacting with each other.  This is particularly true for jobs in which specialized experience or skills are valuable, such as engineers and other skilled workers in the aerospace industry. Market "frictions" result when, as here: (1) workers are not fully informed about all alternatives available to them; (2) it is costly for workers to move between employers; and (3) there are a limited number of essentially identical positions from which workers can choose.  Such market frictions adversely impact competition in labor markets, and generally provide market power to employers. These market frictions and resulting market power are well-recognized in labor economics.

52.    Defendants' conspiracy injured employees with experience or skills in the aerospace industry in part because Defendants are market leaders in their fields. During the Class Period, Defendant Pratt & Whitney was one of the largest aerospace engine design, manufacture, and service companies in the United States.

53.    Defendants also are among the largest employers in the aerospace industry, with a nationwide reach.

54.    The specialized knowledge relevant to work in the aerospace industry is subject to not only market frictions, but also high supply-demand pressures.  There is high demand for and limited supply of engineers and other skilled workers in the aerospace industry.  Employees within the industry are key sources of potential talent to fill these openings.

55.    Defendants employ a variety of recruiting techniques, including using internal and external recruiters to identify, solicit, recruit, and otherwise help hire employees.  Defendants also receive direct applications from individuals interested in employment opportunities.

56.     Soliciting employees from other Suppliers is a particularly efficient and effective method of competing for engineers and other skilled workers.  Soliciting involves communicating directly – by phone, email, social and electronic networking, or in person – with competitors' employees who have not applied for a job opening.  Such direct solicitation can be done by the soliciting firm's personnel or by outside recruiters.  Firms in the aerospace industry rely on direct solicitation of employees of other aerospace companies because those individuals have specialized experience and may not respond to other methods of recruiting.

57.     In a properly functioning and lawfully competitive labor market, employers of engineers and other skilled workers in the aerospace industry would compete with one another to attract and retain employees for their needs.  This competition among employers for those employees would determine the level of compensation.  Competition would also improve the employees' ability to negotiate for better salaries and other terms of employment.

58.     In the absence of a prior agreement, companies like Defendants would solicit and hire engineers and other skilled workers from other companies in the aerospace industry because those employees have training and experience that are lacking in hires from other industries. Hiring employees from a different industry requires the company to invest significant resources in identifying, assessing, and training those employees, and is particularly unsuitable for senior-level positions.  For these reasons and others, lateral hiring within the aerospace industry is a key form of competition in this industry.  In this case, Defendants prevented that competition through their illegal conspiracy, apparently concluding that the profits to be made by suppressing wages in the labor market outweighed the benefits to be gained from competing with each other in the labor market.

59.     Competition for workers via lateral hiring has a significant impact on compensation in a number of ways.  First, competition facilitates the flow of information about opportunities and compensation.  For example, employees who are solicited, interviewed, or offered a job by a rival employer gain insight into how other companies value their work and experience, and what compensation and benefits their competitors typically pay or are willing to pay to induce them to leave their current employer.  This information is not otherwise readily available to employees, who generally rely on these encounters and word-of-mouth from peers and colleagues for such information.  Employers, on the other hand, often hire private consulting firms to gather information regarding market compensation rates.  In a labor environment where price discovery is already inhibited, no-poach agreements further restrain employees' access to this crucial information by eliminating or reducing the communications that encourage the flow of information.

60.     Defendants' conspiracy precluded information about pay and benefits from reaching employees at Defendants' companies.  Those employees would have used that information to negotiate higher pay at their existing jobs, or to accept superior offers from their employers' competitors.  Indeed, empirical economic research confirms that employees who change jobs voluntarily typically have faster wage growth than those who remain in the same job.  These employees also could have shared this information with their co-workers, multiplying the impact of each offer as the information would have spread through social channels.  Among other things, Defendants refrained from informing employees or others who were targets of the conspiracy of the fact of the conspiracy and acted to conceal the fact of the conspiracy by giving pretextual explanations for hiring or compensation decisions, and omitting such decisions were made on the basis of the illegal agreements, not because of market conditions or because of the

worth or value of employees. These acts precluded employees from possessing highly relevant information.

61.     Second, the threat of losing employees to competitors encourages employers to preemptively increase and maintain appropriately high compensation to ensure high morale, productivity, and retention. Absent appropriate compensation, employees are more likely to seek better compensation elsewhere, be receptive to recruiting by competitors, limit their productivity, and undermine morale. Once an employee has received an offer from another company, the employer may have to increase compensation to retain that employee and increase compensation for other employees as well. In a competitive labor market, such preventive retention measures thus lead to increased compensation for employees. But in the aerospace industry, Defendants' conspiracy substantially spared them from taking such measures, lowering employee pay.

62.     Third, because many aerospace employees are integrated into teams, some workers who move to different companies may bring others with them. Just as competition forces employers to preemptively or reactively raise compensation to retain employees who might otherwise seek employment elsewhere, it also encourages increased compensation for these related workers. Thus, increased movement of one category of employee not only increases the compensation for those employees, but also for the categories of employees who are likely to move with them.

63.     Defendants, like other sophisticated companies, maintained internal compensation systems and developed compensation structures that preserved relatively stable relationships between the pay of their employees. The effect of such systems is that an adjustment to the pay of some employees will lead to adjustments to the pay structure as a whole, affecting the pay of all employees. Distortions to the labor market's competitive process, such as the distortions caused

by Defendants' no-poach agreements, suppressed the pay of all employees who shared common pay structures, not just those who proactively sought to work for another aerospace company or Supplier.  Moreover, because the pay rates for jobs within pay structures were tied together, the compensation of all employees was affected by Defendants' no-poach agreements.

64.     To maintain productivity and morale and to retain employees, in the absence of a prior agreement, employers such as Defendants would also consider the perceived fairness of their compensation systems.  Defendants thus had an incentive to ensure that their employees felt that their compensation was fair based on broad comparisons across job descriptions and titles within the company and as compared to other companies in the industry.

65.     What constitutes "fair" is based on comparisons that employees draw between themselves and other employees at their company and in their field.  For example, employees generally would not consider it fair for there to be pay differentials for workers doing the same work at the same level at the same company based solely on the fact that some of these employees received an outside solicitation or offer of alternate employment.

66.     Fairness concerns often involve both "internal equity" and "external equity." "Internal equity" depends on the extent to which employees perceive pay levels to be fair and objective compared to other employees *within* the same company.  "External equity" depends on the perception of the fairness of pay levels compared to similar employees ***outside*** the company. Defendants' pay structures should have been designed, constructed, and maintained to accomplish both internal and external equity goals, but they were undermined by the illegal agreements.

67.     Companies foster both internal and external equity by maintaining formal compensation systems that restrict discretionary pay decisions and focus on more objective criteria such as job descriptions and classifications, wage levels for equivalent jobs in the labor market, pay

differentials based on experience and levels of responsibility, and other factors affecting the perceived fairness of the compensation system.  In sum, pay systems adjust pay levels across job titles and pools of employees to maintain internal and external equity to better foster good morale and motivate employees across a company's labor force.  Because of these systems, the pay of one employee always bears a relationship to the pay of other employees.

68.     These pay systems are systematically monitored and adjusted from the top down by senior management, with regular company-wide reviews and assessments.

69.     Because of such formal systems, however, Defendants' no-poach agreements would have affected the proposed Class as a whole, and not just individual employees who would have otherwise received job offers from rival companies in the industry.

70.     Due to internal and external equity considerations, increasing the pay of one employee in order to retain that employee leads to pay raises not only for those who perform similar work (and thus are within the same pay bands or grades), but also for a wider swath of employees who base their notions of fair compensation on certain degrees of differentials between themselves and those other employees.   Conversely, a no-poach agreement suppresses compensation not only for employees who would have received competitive offers, but for other employees as well.  These systematic effects occur both at the same time, through firm-wide pay adjustments and reviews, and over time, as pay structures adjust to account for internal and external equity.

71.     Defendants' conspiracy restrained competition for engineers and other skilled workers and disrupted the normal bargaining and price-setting mechanisms that apply in competitive labor markets. The conspiracy suppressed the compensation of all engineers and other skilled workers, not just particular individuals who otherwise would have been solicited or sought

to change employers.  The effects of eliminating solicitation, pursuant to agreement, caused widespread impact on Defendants' employees by eliminating or reducing the flow of information and the need for preventive and reactive increases to compensation for the entire Class.

## Effects on Interstate Commerce

72.    During the relevant time period, Defendants employed members of the Class throughout the United States, including in this judicial district.

73.    Defendants' conspiracy substantially reduced competition for engineers and other skilled workers in the aerospace industry and suppressed the efficient movement and compensation of aerospace industry employees, harming Plaintiff and members of the Class.  Because the no-poach agreements enabled Defendants to maintain suppressed compensation levels generally, the harm extended not only to those who sought, or otherwise would have sought, to change companies, but also to those who had no intention of seeking other employment.

74.    Thus, Defendants' no-poach agreements and related conduct substantially affected interstate commerce for the services of engineers and other skilled workers and caused antitrust injury throughout the United States.

## Plaintiff's Claims Are Timely

75.    Until December 9, 2021, when the DOJ publicly announced the criminal complaint against Patel, Plaintiff and members of the proposed Class did not know, and could not have discovered through the exercise of reasonable diligence, that Defendants were engaged in secret no-poach agreements.

76.    Defendants did not publicize their no-poach agreements, did not inform job applicants about the conspiracy, and acted in a manner deliberately designed to avoid detection of the conspiracy.  Knowledge of the agreements was closely held by executives and recruiters of the

Defendant companies, who relied on direct and non-public communications with one another to manage and enforce the no-poach agreements, including in-person discussions, telephone conversations, and private email communications. None of the relevant communications alleged herein were made public until after the release of the DOJ's criminal complaint against Patel.

77.    Additionally, rather than disclose their non-solicitation agreements, Defendants devised internal procedures to identify affected applicants, and gave false and pretextual explanations for hiring and compensation decisions that, in fact, were made pursuant to Defendants' unlawful agreement.

78.    Until recently, Plaintiff and Class members did not discover and did not know of facts that would have caused a reasonable person to suspect that Defendants were conspiring to restrain competition for the services of their engineers and other skilled workers.

79.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule, the doctrine of equitable tolling, and/or Defendants' fraudulent concealment. Defendants are thus estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

80.    Plaintiff brings this action individually and as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

> All natural persons who worked as engineers and other skilled workers in the United States between January 1, 2011 and September 30, 2019 ("Class Period") for one or more of the Defendants. The term "engineers and other skilled workers" will be defined with reference to specific job titles upon Plaintiff's analysis of discovery materials. Excluded from the Class are senior corporate officers and personnel in the human resources, recruiting, and legal departments of the Defendants.

81.     Plaintiff reserves the right to amend the Class definition, define subclasses, and expand or narrow the proposed Class based on information obtained in discovery and expert analysis of such information.

82.     There are thousands of members of the Class as described above, the exact number and their identities being known by Defendants, making Class members so numerous and geographically dispersed that joinder of all members is impracticable.

83.     The Class is precisely ascertainable from Defendants' records.

84.     Plaintiff's claims are typical of the claims of the proposed Class as they arise out of the same course of Defendants' conduct and the same legal theories.

85.     Plaintiff will fairly and adequately represent the interests of the proposed Class and has no conflict with the interests of the proposed Class.

86.     There are numerous questions of law and fact common to each Class member, including, but not limited to:

  a.     whether Defendants and their co-conspirators agreed not to solicit or hire each other's employees;

  b.     whether such agreements were *per se* violations of the Sherman Act;

  c.     whether Defendants have fraudulently concealed their misconduct;

  d.     whether and the extent to which Defendants' conduct suppressed compensation below competitive levels for Plaintiff and the proposed Class;

  e.     whether Plaintiff and the Class suffered antitrust injury as a result of Defendants' agreements;

  f.     the type and measure of damages suffered by Plaintiff and the Class; and

g.      the nature and scope of injunctive relief necessary to restore a competitive market.

87.     During the Class Period, Plaintiff was employed by Belcan as an Engineering Intern and Project Engineer.  Plaintiff's interests are coincident with and not antagonistic to those of other members of the Class.

88.     Plaintiff is a member of the Class, has claims that are typical of the claims of the Class, and will fairly and adequately protect the interests of the Class. In addition, Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

89.     The above-referenced common questions of law and fact predominate over any questions affecting only individual members of the Class.

90.     Defendants have acted on grounds generally applicable to the proposed Class, thereby making final injunctive relief appropriate with respect to the proposed Class as a whole.

91.     A class action is superior to any other means of resolving this litigation. Separate actions by individual Class members would be inefficient and would create the risk of inconsistent or varying judgments.  There will be no material difficulty in the management of this action as a class action.

## FIRST CLAIM FOR RELIEF

## (Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)

92.     Plaintiff realleges and incorporates by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

93.     Defendants, by and through their officers, directors, employees, or other representatives, entered into and engaged in an overarching conspiracy, consisting of unlawful

agreements in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1. Specifically, Defendants and their co-conspirators agreed to restrict competition for Class members' services through refraining from soliciting or hiring each other's engineers and other skilled workers, thereby fixing and suppressing Class members' compensation.

94.    Defendants' conspiracy included concerted action and undertakings with the purpose and effect of: (a) fixing Plaintiff's and the Class's compensation at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants for employees.

95.    Defendants' combinations and conspiracy injured Plaintiff and other members of the Class by suppressing their compensation and depriving them of free and fair competition in the market for their services.

96.    Defendants' conduct and agreements are *per se* violations of Section 1 of the Sherman Act.

97.    Defendants' conduct is ongoing, continues to create immediate irreparable harm, and will continue to do so in the future if not enjoined.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the proposed Class of similarly situated persons, respectfully requests that:

A.    The Court certify this lawsuit as a class action under Rules 23(a), 23(b)(2), and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be designated as class representative, and that Plaintiff's counsel be appointed as Class counsel for the Class;

B.    The Court declare, adjudge, and/or decree that the conduct alleged herein is *per se* unlawful under Section 1 of the Sherman Act, 15 U.S.C. §1;

26

C.      Plaintiff and the Class recover their damages, trebled, and the costs of the suit, including reasonable attorneys' fees as provided by law;

D.      The Court enter an injunction enjoining Defendants from enforcing the unlawful conspiracy or entering into similar agreements going forward; and

E.      The Court award such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, individually and on behalf of the proposed Class, demands a trial by jury on all issues so triable.

Dated: December 17, 2021            **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/  Erin Green Comite
Erin Green Comite (CT 24886)
Michael P. Srodoski*
156 South Main Street
P.O. Box 192
Colchester, CT  06415
Tel.:  860-537-5537
Fax:  860-537-4432
ecomite@scott-scott.com
msrodoski@scott-scott.com

Walter W. Noss*
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway
Suite 3300
San Diego, CA  92101
Tel.:  619-233-4565
Fax:  619-233-0508
wnoss@scott-scott.com

Linda P. Nussbaum*
**NUSSBAUM LAW GROUP, P.C.**
1211 Avenue of the Americas
40th Floor
New York, NY 10036
Tel.:  (917) 438-9189
lnussbaum@nussbaumpc.com

Roberta D. Liebenberg*
Gerard A. Dever*
Jessica Khan*
**FINE KAPLAN AND BLACK, R.P.C.**
One South Broad St., 23rd Floor
Philadelphia, PA 19107
Tel.: (215) 567-6565
rliebenberg@finekaplan.com
gdever@finekaplan.com
jkhan@finekaplan.com

*Counsel for Plaintiffs and the Proposed Class*

*\*Pro hac vice forthcoming*